UNITED STATES of America,
Plaintiff,

v.

Andrew N. BISHOP, Defendant.

No. 97–CR–196G.

United States District Court,
D. Utah,
Central Division.

Aug. 17, 1999.

David J. Schwendiman, Assistant U.S. Attorney, Salt Lake City, UT, for plaintiff.

Fred Metos, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER REGARDING POLYGRAPH TEST

J. THOMAS GREENE, District Judge.

An evidentiary hearing was held on July 20, 1999 on defendant Bishop's Motion in Limine concerning admissibility of results of a polygraph examination. Oral testimony was given and exhibits were received into evidence. The matter was extensively briefed, and argued to the court on August 16, 1999.

The court now issues Findings of Fact, Conclusions of Law and its ruling with respect to the motion. However, the court reserves the right to issue a memorandum opinion in amplification of the decision reached in this case.

### FINDINGS OF FACT

1. On March 11, 1999, defendant Bishop underwent a polygraph examination concerning charges against him set forth in a pending Grand Jury Indictment. The defendant's answers were scored as non deceptive and truthful by the polygraph examiner. The case is set for trial against defendant Bishop and other codefendants to commence on August 30, 1999.

2. A control question technique was utilized in the polygraph examination, which was scored by a zone of comparison system. The examination was conducted by Virgil Johnson, a licensed polygraph examiner in the State of Utah for the past fourteen years.

3. Polygraph examinations measure involuntary reactions of the human body in order to determine whether a person is engaging in deception. The underlying field of knowledge is psycho-physiology.

4. The control question technique utilizes a machine which measures and records changes in respiration, blood pressure and sweat gland activity. During the course of the examination the examinee's involuntary responses are recorded at the time the examinee answers questions put

by the examiner. Readings of reactions to answers to control questions are then compared with readings for relevant questions, and a "score" is calculated. Relevant questions are those in which deception would bear directly upon a matter at issue, in this case guilt or innocence of charged crimes.

5. The control question technique has been the subject of multiple field and laboratory tests over the years, yielding mixed results. Various studies place polygraph accuracy generally between 80% to 95%. However, extrapolation of exact figures is nearly impossible due to the nature of the subject matter and an inherent inability to isolate control factors. No polygraph studies utilizing the control question technique or other techniques have specifically addressed deception concerning alleged acts of terrorism.

6. The control question technique has been the subject of peer review and publication, but experts are divided on the accuracy and reliability of polygraph techniques.[1] Although a majority of psychophysiologists endorse the science upon which the technique has been developed, there is a lack of consensus as to the efficacy of the technique as applied.

7. Evidence presented at the hearing before this court on July 20, 1999, was to the effect that the rate of error (false negative) for control question polygraph examinations is approximately 5% in identification of persons as truthful in assertions of innocence when that is not so. The rate of error (false positive) in identification of persons as deceptive when that is not so, is about 10%.

8. The control question polygraph technique has thus far failed to achieve "general acceptance" in the relevant scientific community. Defendant's expert, Dr. David Raskin, testified at the hearing that only about 55 psycho-physiologists are so fully educated and informed as to constitute an expert scientific community with regard to the reliability of the polygraph. However, no evidence was presented identifying this specific group individually, or setting forth the level of acceptance in this group. Several studies during the period 1984 through 1994 provide mixed conclusions by psycho-physiologists regarding the efficacy and usefulness of polygraph tests. In 1993 a survey of members of the Society for Psycho Physiological Research was conducted to determine the scientific community's opinions of polygraph tests, and whether opinions had changed since a similar Gallup survey was conducted in 1984. 39% of those surveyed responded that the polygraph was of questionable or no usefulness, which was consistent with the prior survey thus indicating that opinions had not significantly changed.[2] The court finds the evidence to be inconclusive that there is general acceptance in the relevant scientific community of the usefulness and reliability of polygraph tests.

9. Evidence was presented at the hearing that certain well prepared or coached examinees are capable of regularly "beating" the polygraph test through the use of counter-measures. Additionally, evidence was presented that such individuals are capable of avoiding detection of counter-measure employment by trained polygraphers, even when such trained examiners

---

1. Defendant's expert, Dr. Raskin, acknowledged that there is no unanimity in peer review. In this regard, the government submitted as an exhibit two chapters from a book by Dr. David T. Lykken who criticizes the validity and reliability of the polygraph: "A Tremor in the Blood: Uses and Abuses of the Lie Detector" (New York; Phenum Press, 1998.)

2. Of 135 psychophysiologists responding from 450 randomly selected members, only 41 rat-

ed themselves as "Highly Informed" concerning interpretation of test results. 33 rated themselves as "Poorly Informed," with the bulk of the respondents somewhere in between. Of the "Highly Informed" group, about 20% responded that the polygraph was of questionable or no usefulness, while about 80% responded that polygraph test interpretation as to whether a subject is or is not telling the truth "is a useful diagnostic tool when considered with other available information."

are alerted to the possibility of use of such counter measures by an examinee.

10. This Court finds that ex-parte polygraph examinations are particularly unreliable. In the instant case the government did not participate in the selection of the polygrapher, the polygraph technique utilized, or the questions used. Submission to a polygraph test by a defendant in the absence of a stipulation between the defendant and the government creates a situation in which a defendant has nothing to lose and everything to gain by taking such a test. Furthermore, failure to involve the government leaves open the possibility that the defendant could take multiple examinations until one yielded the desired result.

11. In this case, the polygraph test as administered was flawed and unreliable. In the first and second relevant questions which were compared with control questions, the defendant was asked to respond with respect to whether he had anything to do with an "attempt" to bomb the Fur Breeders premises, and whether he "participated" in the bombing. However, at no time during the examination was the technical or legal meaning of "attempt" or "participation" defined by the examiner or discussed with the defendant. Thus, in answering the first two relevant questions, the defendant may have had firmly planted in his mind a defense oriented, legalistic definition of those key words, which possibly could have resulted in his answers being scored as truthful based upon his understanding of the meaning of those terms rather than the meaning which would be defined to the jury. The third and final relevant question related to defendant's possible involvement in construction of the pipe-bombs used in the bombing, an act with which the defendant has never been charged. Defendant's answer to the pipe-bomb construction question was not directly relevant to potential deception concerning a crime charged against defendant, and may have undermined at least in part the evidentiary reliability of the examination.

## CONCLUSIONS OF LAW

1. The polygraph evidence offered is "scientific, technical, or other specialized knowledge" as contemplated by the Supreme Court's opinions in *United States v. Daubert* and *Kumho Tire v. Carmichael,* and Rule 702 of the Federal Rules of Evidence.

2. Polygraph evidence, while relevant in part to the ultimate issue of deception, is not sufficiently reliable at the present time to satisfy the requirements of Rule 702.

3. The results of the polygraph test as administered in this case are not sufficiently reliable to satisfy the requirements of Rule 702.

4. The probative value of the polygraph evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury under Rule 403 of the Federal Rules of Evidence. This Court concludes there is a substantial risk that the jury would tend to place undue weight upon the test results and would tend to be misled and improperly influenced. Furthermore, the core function of the jury to assess evidence and make its own determinations with respect to truthfulness and veracity, as well as determination of credibility in general, would be endangered and weakened, if not altogether usurped, by allowing this evidence to be admitted at trial. Definitions set forth in instructions by the court to the jury of such terms as "attempt" and "participation" could be confusing to the jury if the defendant were allowed to testify concerning those terms as they were understood by the defendant in the polygraph test.

Based upon a review of all oral and documentary evidence presented at the hearing on July 20, 1999, including the tape of the entire test as administered to defendant Bishop, this court finds and concludes that the polygraph test results should not be admitted in evidence at the trial in this case under either Rule 702 or

Rule 403 of the Federal Rules of Evidence. Accordingly, it is hereby

ORDERED, that defendant Bishop's Motion in Limine is DENIED.